UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES FRANK EARL                                                      CIVIL ACTION

VERSUS                                                          NUMBER: 12-2443

DEMILLE TOPPS, ET AL.                                     SECTION: "F"(5)

**REPORT AND RECOMMENDATION**

This 42 U.S.C. §1983 proceeding was filed *in forma pauperis* ("IFP") by *pro se* Plaintiff, James Frank Earl, against Defendants, Demille Topps, Warden of the Washington Parish Jail ("WPJ"); Wally Cummings, Assistant Warden of WPJ; and, Robert Crowe, the former Sheriff of Washington Parish (Rec. doc. 1, pp. 1, 5).

At all pertinent times herein, Plaintiff was an inmate of WPJ in Franklinton, Louisiana. By way of his original complaint, Plaintiff generally complained of "poor living conditions" at the aforementioned penal facility in that "people are sleeping on floors all over the jail" and that the floors become very wet on instances when the HVAC system is not functioning. Plaintiff additionally alleged, in an equally general fashion, that "[m]edical is poor," that he is forced to eat cold, salted food which is contraindicated by his hypertension, that the showers have black worms around them and mold on the inside of them, and that the jail's roof has leaks in it. In his prayer for relief, Plaintiff asked that betterments be made to the WPJ Medical Staff, that he be served hot meals every day, and that he be awarded an unspecified amount of monetary compensation. (Rec. doc. 1, p. 6).

In due course, a preliminary conference was held via telephone with Plaintiff and counsel for the Defendants participating. (Rec. doc. 12).[1/] During the course of that conference, Plaintiff focused exclusively on his claims regarding the alleged deliberate indifference to his serious medical needs and the presence of mold at the jail. With respect to the former claim, Plaintiff alleged that on unidentified instances he was refused medical attention that he requested and that the medication that he was receiving was ineffective. At the time of the conference, Plaintiff was undergoing treatment for a hernia and stomach issues, including GERD, for which he had been told that surgery may be required but he was unsure precisely if or when that would take place. Plaintiff further advised that he suffered from scoliosis of the spine and torn muscles in his back but had not received adequate pain medication for those conditions as it was thought to possibly exacerbate his stomach issues. Plaintiff also suffered from poorly-controlled high blood pressure and edema which was ineffectively managed with fluid pills. Medications at the time included Prilosec, Coreg, Lopressure, Lisinopril, Lasix, potassium, and Aldacton. (*Id*.).

When queried as to why he had sued the individuals named as Defendants herein, Plaintiff indicated that everything had gone through the Warden as the senior-ranking jail official, that the Assistant Warden was similarly situated in the chain of command, and that the Sheriff was at the top of the parish executive branch hierarchy. Despite acknowledging that he had received treatment, including medications, for his various conditions, Plaintiff expressed uncertainty over precisely who was responsible for providing medical care to

---

[1/] Although scheduled as a preliminary conference, the proceeding was actually more akin to a *Spears* hearing which is in the nature of an amended complaint or a more definite statement. *See Jackson v. Vannoy*, 49 F.3d 175, 176-77 n.4 (5th Cir.), *cert denied.*, 516 U.S. 851, 116 S.Ct. 148 (1995).

inmates at WPJ.  At the conclusion of the conference, the Sheriff was ordered, *inter alia*, to obtain a complete medical examination of Plaintiff at which any health-related questions were to be addressed and to implement a chronic care plan if that was recommended by prison medical officials.  Plaintiff's WPJ medical records were also ordered and have since been provided to the Court and to Plaintiff.

The medical records that are before the Court indicate that on January 31, 2011, Plaintiff requested a review of his prescribed medications, particularly those for his back pain.  Pursuant to that request, Plaintiff was seen by Dr. Jerry Thomas on February 8, 2011 with the chief complaint being identified as chronic back pain.  Plaintiff's past medical records were ordered, he was continued on Motrin, and Flexeril twice daily was added for his back discomfort.  Plaintiff's blood pressure medications, Lisinopril and hydrochlorothiazide, were also continued as was Norvasc.  He was advised to apply baby oil to his face twice per day for an apparent skin condition and his blood pressure was to be monitored.

On June 14, 2011, Plaintiff was seen at the LSU Bogalusa Medical Center ("BMC") for complaints of facial swelling for the previous three days.  The fluctuant area was identified in the Emergency Department ("ED") and the diagnosis was periorbital cellulitis that was treated with antibiotics over the course of a several-day inpatient stay.  Plaintiff was ultimately discharged on June 19, 2011 with prescriptions for Bactroban, Cyclobenzaprine, Doxycycline, Hyclate, Ibuprofen, Lisinopril, Metoprolol Tartrate, and Norvasc.  On June 23, 2011, Plaintiff was given a refill on Bleph eyedrops.

On July 10, 2011, Plaintiff initiated a grievance within WPJ's Administrative Remedy Procedure ("ARP") in which he complained that he had been out of his back pain medication, Cyclobenzaprine, for over a month. In a handwritten notation on the grievance form from jail personnel dated July 13, 2011, it was noted that Plaintiff had been given a thirty-day supply of the medication upon his recent discharge from the hospital. A request for a further refill was sent to the pharmacy that same day. The records that have been provided to the Court also include a letter to the Sheriff dated July 20, 2011 in which Plaintiff complained of the adequacy of follow-up care for his left eye. Plaintiff was seen by Dr. Thomas on July 25, 2011 who noted no swelling or drainage to the left eye or periorbital area and that the previous facial cellulitis had resolved. As a precaution, Plaintiff was placed on a seven-day course of Bactrim DS and he was continued on Motrin and Flexeril.

On September 13, 2011, Plaintiff completed a "Request for Medical Treatment" form in which expressed an inability to breathe when in a prone position and a desire to see the doctor "A.S.A.P." However, when he was provided the opportunity to see the doctor two days later, Plaintiff declined. Plaintiff submitted another sick call request form on October 25, 2011 complaining of bad chest pains. He was seen by Dr. Thomas for that complaint on October 27, 2011 as well as GERD symptoms on the right in the form of indigestion and reflux. Blood pressure was recorded as 160/119 at the time but a physical examination was otherwise unremarkable with Plaintiff having a regular heart rate and a soft abdomen. Flexeril was discontinued, the dosage of blood pressure medication was increased, and Prilosec was added to Plaintiff's mediation regimen. An EKG was also ordered.

4

The next medical records were generated on February 14, 2012 when Plaintiff was seen again by Dr. Thomas.  By that time, Plaintiff had apparently been taken to the hospital where an EKG was done but he complained that x-rays had not been taken.  He also complained of an isolated dark stool as well as a non-specific itch but stated that Prilosec had helped.  Various tests were ordered and Plaintiff was prescribed Prilosec and Benadryl.  In a summary of medical treatment, Dr. Thomas noted that Plaintiff had also been seen in the ED for a cough and indigestion and was placed on a triple treatment regimen for positive H. Pylori consisting of Amoxicillin, Biaxin, and Prevacid.  He was referred to Gastroenterology for additional consultation.

Plaintiff was seen again at the BMC ED on March 8, 2012 for a cough and indigestion.  Bloodwork was done as was a CT scan of the chest.  The clinical impression was GERD and Plaintiff was prescribed additional quantities of Amoxicillin, Biaxin, and Prevacid.  On April 16, 2012, a $40.00 medical charge was credited back to Plaintiff's Inmate Trust Fund.  The following day, WPJ staff requested the test results from March 8, 2012 in preparation for a follow-up evaluation to be conducted by Dr. Thomas.  Plaintiff completed another sick call request form on April 22, 2012, reporting that he had passed out after awakening the previous morning for unknown reasons.  On April 24, 2012, Plaintiff initiated another ARP grievance, directed to one Kim Brumfield, requesting that all prescriptions other than his blood pressure medication, which he had a several-month supply of, not be refilled but that the dosage of his acid reflux medication be increased.

On April 27, 2012, Plaintiff was re-evaluated by Dr. Thomas for continued complaints of indigestion.  Although Plaintiff had no complaints of dizziness or other

symptoms, he was given Norvasc and was sent to the ED for further evaluation as his blood pressure was elevated at 220/130. Motrin was discontinued. Plaintiff was returned to the BMC ED on May 28, 2012 for continued care of his H. Pylori infection and was prescribed Prevacid, Amoxicillin, and Clarithromycin. An EGD was to go forward within two to three weeks. On May 29, 2012, jail staff requested via facsimile an appointment with the BMC Gastroenterology Clinic. Despite Plaintiff being on four different medications, his blood pressure was still elevated at 172/125 when he was next seen by Dr. Thomas on June 28, 2012. Plaintiff also complained of abdominal pain and vomiting for the previous one to two weeks but he was alert, oriented, and in no acute distress. Breath sounds were equal and clear, the heart had a regular rate, and a mild abdominal wall hernia was noted upon examination of the abdomen. The assessment was GERD, hypertensive vascular disease, a hiatal hernia, and an abdominal wall ventral hernia. Plaintiff was prescribed Protonix, a gastrointestinal consultation with Dr. Hussain was scheduled, and Clonidine was dispensed on the spot with instructions that Plaintiff get his medications as directed.

Plaintiff was next seen at the Gastroenterology Clinic on July 12, 2012 where it was noted that his GERD-related symptoms continued to persist despite being on numerous medications. The impressions were GERD, epigastric pain, and positive H. Pylori. An EGD was to be scheduled for August 7, 2012 and Plaintiff was continued on Protonix and was to avoid NSAID use. On July 16, 2012, Plaintiff corresponded with Kim Brumfield via an ARP grievance form requesting information about his next hospital visit so he could prepare for the scheduled procedure. That inquiry was responded to on July 17, 2012 and Plaintiff was

told that the testing would take place the following month and that he would be instructed beforehand of the preparatory steps that he would have to take in advance of the testing.

On August 7, 2012, Plaintiff underwent an EGD with biopsy at the hands of Dr. Hussain after a complete physical examination and pre-operative clearance the previous day. The post-operative diagnosis was distal esophagitis, gastritis, a hiatal hernia, and duodenitis. Plaintiff was continued on Protonix and a soft, bland diet with instructions to avoid NSAIDs, tobacco and alcohol consumption, and caffeine. Informational handouts were also given to Plaintiff on esophagitis, gastritis, and hiatal hernias. On August 17, 2014, Plaintiff was seen by the jail physician and was given prescriptions for Protonix and Amlodipine.

On August 28, 2012, Plaintiff completed another sick call request form in which he complained that his back pain had worsened and that he still had stomach pain as well as other issues that needed to be discussed. Three days later, Plaintiff was seen again by Dr. Thomas for complaints of stomach and back pain and for having missed a Surgery Clinic appointment scheduled for August 14, 2012. Plaintiff's blood pressure was stable at 150/92 but he had 2+ edema to the lower extremities bilaterally. The assessment was chronic gastritis, a ventral hernia, and edema. HCTV was discontinued but Plaintiff was continued on Protonix, Zantac, Lasix, Tylenol twice per day for pain relief, and K-Durr. Various tests were to be scheduled as was another appointment with the Surgery Clinic. When seen again by the jail physician on September 27, 2012, Plaintiff still had edema to the legs. The assessment was edema and the dosage of Lasix was increased. Tests were run the following day including a complete metabolic panel and a lipid panel. Pedal edema

7

was still present on October 9, 2012. Zantac and Norvasc were discontinued and Plaintiff was provided Lisinopril and Prilosec.

On October 23, 2012, Plaintiff refused all prescribed medications during morning pill call, stating that the medical staff was not treating him right and threatening to file suit. He was noted to be in no acute physical distress but he did have edema bilaterally in the lower extremities. Plaintiff was furnished an "Inmate Medical Refusal Form" to complete as well as ARP forms through which to air his grievances. Two days later, Plaintiff was seen again by Dr. Thomas for persistent edema and complaints of shortness of breath. His blood pressure was recorded as 168/102. At the time of the evaluation, Plaintiff had no chest pain, only occasional symptoms referable to his hiatal hernia and reflux, a regular heart rate, and clear lungs with no rales. Edema was 2+ in the extremities. Chest x-rays were taken as was an EKG which produced results compatible with ischemic heart disease. Adjustments were made to the dosages and frequency of Plaintiff's Lasix, Lisinopril, and Prilosec with the possibility that Norvasc may need to be restarted. Plaintiff was also referred to the Cardiology Clinic for further evaluation. An EKG that was subsequently done there on October 29, 2012 was normal and the diagnosis was atypical chest pain and GERD.

Plaintiff was next seen at the BMC on November 6, 2012 as a follow-up to abnormal EKG results. His blood pressure was 151/87 at that time. An exercise stress test ("EST") was scheduled as well as other tests. Aldactone was added to Plaintiff's medication regimen by Dr. Thomas on November 12, 2012. An EST was performed on December 5, 2012 which was negative for ischemia and an echocardiogram was also read as normal.

The impressions were hypertension, diabetes mellitus, and obesity. It was recommended that Plaintiff be restarted on Norvasc at 10 mg. daily and he was discharged from the Cardiology Clinic. Plaintiff was seen again by Dr. Thomas for complaints of abdominal pain on January 3, 2013. The diagnosis was GERD, coronary artery disease, and diabetes.

Pursuant to the Court's order, Plaintiff was evaluated yet again by Dr. Thomas on February 7, 2013. Plaintiff was described as stable at the time with no complaints except for some back spasms. There was no shortness of breath, no chest pain, and no edema in the extremities. The "problem" list was as follows: 1) hypertension, confirmed through an abnormal EKG and a complete cardiological workup; 2) pedal edema that resolved with medication adjustment; 3) GERD, stable through medication, and a complete gastrointestinal workup and gastroenterology consultation; 4) a hiatal hernia; 5) an abdominal wall ventral hernia; 6) back pain; and, 7) a history of scoliosis as reported by Plaintiff but without obvious physical findings. All in all, Plaintiff was still stable on his then-current medication regimen, further bloodwork results were pending, and he was to be seen again following receipt of those results.

Additional bloodwork was performed on May 7, 2013. On November 27, 2013, Plaintiff underwent bilateral mammogram studies which were negative. X-rays taken on January 10, 2014 revealed enlargement of the cardiomediastinal silhouette without convincing evidence of acute cardiac decompensation. Further labwork was done on January 16, 2014. On February 28, 2014, Plaintiff was prescribed Amoxicillin to treat an outbreak of uvulitis. Plaintiff still complained of some breast enlargement when he was next seen by Dr. Thomas on May 20, 2014 but no masses were detected. A scaly lesion was

9

noted on Plaintiff's scalp. He was prescribed Trazodone and Lotrisone, Elavil was discontinued, and more bloodwork was ordered. That testing was done the following day. Finally, on June 23, 2014 Plaintiff underwent diagnostic radiology of the orbital area following an initial diagnosis of a left periorbital contusion. No acute displaced fracture was appreciated through that testing. It is with the foregoing lengthy history of medical treatment in mind that the validity of Plaintiff's §1983 claims against the named Defendants be assessed.

Plaintiff has instituted suit herein *in forma pauperis* pursuant to 28 U.S.C. §1915. A proceeding brought *in forma pauperis* may be dismissed as frivolous under §1915(e)(2)(B)(i) if the claim alleged therein has no arguable basis in law or fact, *Booker v. Koonce*, 2 F.3d 114 (5th Cir. 1993), or if it fails to state a claim upon which relief can be granted. 28 U.S.C. §1915(e)(2)(B)(ii). *See also* 28 U.S.C. §1915A(b)(1), 42 U.S.C. §1997e(c). Giving the instant complaint a liberal reading, it is the recommendation of the Magistrate Judge that this matter be dismissed as frivolous and for failing to state a claim upon which relief can be granted.

As noted earlier, the named Defendants in this proceeding are the Warden and Assistant Warden of WPJ and the former Sheriff of Washington Parish. In his complaint, Plaintiff set forth no facts demonstrating any personal involvement on the part of the named Defendants in the matters of which he complains herein. During the course of the preliminary conference that was held in this case, Plaintiff explained that the Defendants were named as such simply because of the supervisory positions that they occupied. Such is insufficient to hold the Defendants liable in either capacity in which they may have been

sued. "'Plaintiffs suing government officials in their individual capacities . . . must allege specific conduct giving rise to a constitutional violation. This standard requires more than conclusional assertions: The plaintiff must allege specific facts giving rise to the constitutional claims.'" *Carter v. Strain*, No. 09-CV-0015, 2009 WL 3231826 at *1 (E.D. La. Oct. 1, 2009)(quoting *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002)). This is so because "'[p]ersonal involvement is an essential element of a civil rights cause of action.'" *Id.* (quoting *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). Supervisory officials like the Sheriff ". . . cannot be held liable for federal civil rights violations allegedly committed by his associates based merely on a theory of strict liability or vicarious liability." *Id.* (footnotes omitted). *Respondeat superior* is simply not a concept which is applicable to proceedings brought under §1983. *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir.), *cert. denied*, 471 U.S. 1126, 105 S.Ct. 2659 (1985); *Lozano v. Smith*, 719 F.2d 756, 768, (5th Cir. 1983); *Douthit v. Jones*, 641 F.2d 345, 346 (5th Cir. 1981).

Moreover, "'[i]n a suit brought against a municipal official in his official capacity, the plaintiff must show that the municipality has a policy or custom that caused his injury.'" *Carter*, 2009 WL 3231826 at *2 (quoting *Parm v. Shumate*, 513 F.3d 135, 142 (5th Cir. 2007), *cert. denied*, 555 U.S. 813, 129 S.Ct. 42 (2008)). "'A plaintiff may not infer a policy merely because harm resulted from some interaction with a governmental entity.'" *Id.* (quoting *Colle v. Brazos County, Texas*, 981 F.2d 237, 245 (5th Cir. 1993)). Rather, the plaintiff ". . . must <u>identify</u> the policy or custom which allegedly caused the deprivation of his constitutional rights." *Id.* (citing *Murray v. Town of Mansura*, 76 Fed.Appx. 547, 549 (5th Cir. 2003) and *Treece v. Louisiana*, 74 Fed.Appx. 315, 316 (5th Cir. 2003).

Measured against the foregoing standards, Plaintiff's claims against the named Defendants should be dismissed pursuant to §1915(e)(2)(B) as personal involvement on their part is lacking and no policy or custom has been identified.

Even if Plaintiff had named a proper defendant, in light of the extensive nature of his treatment records there is no basis upon which to conclude that an Eighth Amendment violation has occurred. In order to prevail on such a claim, a prisoner must demonstrate that prison officials were deliberately indifferent to his serious medical needs which constituted an unnecessary and wanton infliction of pain. *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323 (1991). Deliberate indifference is an "extremely high" standard to meet. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)(internal quotation omitted). A prison official shows deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994). Such a showing requires the inmate to demonstrate that prison "officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Domino v. Texas Dept. of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)(quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

"Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert*, 463 F.3d at 346 (footnote omitted).

The decision of whether to provide additional treatment to an inmate is a classic example of a matter of medical judgment. *Domino*, 239 F.3d at 756. And where a §1983 claim is premised on a delay in the provision of medical care, a prisoner must also allege that he suffered substantial harm as a result of the delay. *Richard v. Martin*, 390 Fed.Appx. 323, 325 (5th Cir. 2010)(citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)); *Taylor v. Bexar County*, No. 10-CV-0045, 2011 WL 759549 at *4 (W.D. Tex. Feb. 23, 2011).

The medical and prison records upon which the Court may properly rely, *Gobert*, 463 F.3d at 346 n. 24, fall far short of establishing the subjective and objective components needed to prevail on an Eighth Amendment claim. "'Deliberate indifference' is a stringent standard of fault, one which requires proof that a municipal actor disregarded a known or obvious consequence of his action." *Ford v. Gusman*, No. 11-CV-2950, 2012 WL 2567063 at *8 (E.D. La. May 11, 2012), *adopted*, 2012 WL 2567034 (E.D. La. July 2, 2012)(citing *Board of the County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 1391 (1997)). It has been equated with "subjective recklessness" as that term is used in criminal law. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997).

During the course of the preliminary conference that was held in this case, Plaintiff acknowledged that WPJ medical officials had provided him with treatment but that the treatment had not been fully successful. Such is insufficient to constitute deliberate indifference. *Gobert*, 464 F.3d at 346. The medical records that have been provided to the Court provide scant support for Plaintiff's allegation that requests for medical treatment have been refused on any occasion. To the contrary, the only refusals that the Court can glean from the records were Plaintiff's declination of seeing the jail physician on September

15, 2011 and his rejection of medications during the morning pill call on October 23, 2012. To the extent that the care that was provided to Plaintiff was not furnished as promptly as he might have wished, "[e]xperiencing 'occasional delays in obtaining' medical treatment is insufficient to prove a refusal of providing medical care when the inmate's . . . medical records demonstrate that he received treatment." *Taylor* , 2011 WL 759549 at *4 (quoting *Gobert*, 463 F.3d at 346); *Richard*, 390 Fed.Appx. at 324-25.  In light of the authorities cited above, Plaintiff's §1983 claims against the named Defendants regarding the adequacy of the medical care that he received should be dismissed pursuant to §1915(e)(2)(B)(i) and (ii). *Galo v. Gusman*, No. 10-CV-3343, 2014 WL 430227 at *3 (E.D. La. Feb. 4, 2014).

As for the additional allegations raised in Plaintiff's complaint regarding unsanitary conditions at WPJ and the fact that he was served cold, salted food, "[a]dmittedly, there is a point beyond which a prison's conditions are so unsatisfactory as to render them unconstitutional."  *Hawkins v. Gusman*, No. 10-CV-1178, 2011 WL 1527218 at *3 (E.D. La. Apr. 1, 2011), *adopted*, 2011 WL 1527021 (E.D. La. Apr. 20, 2011)(citing *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004)(confinement in "'extremely filth' [cells] with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls" was unconstitutional)).  The conditions alleged by Plaintiff, while less than optimal, do not rise to this level.  *Wilson v. Lynaugh*, 878 F.2d 846, 849 n.5 (5th Circ. 1989).

With respect to diet, as long as ". . . the State furnishes its prisoners with reasonably adequate food . . . so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight." *Newman v. State of Alabama*, 559 F.2d 283, 291 (5th Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144 (1978); *Jones v. Diamond*, 636 F.2d

14

1364, 1378 (5th Cir.), *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27 (1981).  A prison diet is reasonably adequate when it contains sufficient nutritional value to preserve health.  *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986).  "The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."  *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (5th Cir. 1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492 (1986).

The medical and other prison records that have been provided to the Court reflect that Plaintiff never requested, nor was he ever prescribed, a specialized diet in light of his hypertension and he makes no allegation that his health suffered in any measurable way as a result of the food that he was served.  *See, e.g., Ford*, 2012 WL 2457063 at *10 (citing *Cody v. CBM Corr. Food Servs.*, 250 Fed.Appx. 763, 765 (8th Cir. 2007), *cert. denied*, 552 U.S. 1247, 128 S.Ct. 1482 (2008)).  In any event, Plaintiff's request for compensatory damages for the jail conditions of which he complains is foreclosed by 42 U.S.C. §1997e(e) as he makes no allegation that he suffered a physical injury as a result thereof.  *Herman v. Holiday*, 238 F.3d 660, 666 (5th Cir. 2001)(dismissal of claims for cold showers, cold food, unsanitary dishes, insect problems, a lack of adequate clothing, and the presence of an open "cesspool" near the housing unit appropriate where no physical injury alleged).

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's suit be dismissed pursuant to 28 U.S.C. §1915(e)(2)(B)(i) and (ii).

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within

fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 10th day of July, 2014.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE